# United States Court of Appeals

## For the First Circuit

No. 03-2494

BERNARD J. GLISTA,
Plaintiff, Appellant,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA,
Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. George A. O'Toole, U.S. District Judge]

Before

Lynch, Circuit Judge,
Rosenn,[*] Senior Circuit Judge,
and Lipez, Circuit Judge.

S. Stephen Rosenfeld, with whom Mala M. Rafik and Rosenfeld &
Rafik, P.C. were on brief, for appellant.
Geraldine G. Sanchez, with whom Byrne J. Decker and Pierce
Atwood were on brief, for appellee.
Mary Ellen Signorille and Melvin Radowitz on brief for
American Association of Retired Persons (AARP), amicus curiae.

August 11, 2004

_____

[*] Of the United States Court of Appeals for the Third
Circuit, sitting by designation.

**LYNCH**, <u>Circuit Judge</u>.  Bernard Glista, who is in his mid-fifties, was diagnosed in January 2000 with Primary Lateral Sclerosis (PLS), a rare neurological disorder that arises in adults in mid to late life and causes progressive weakness in the muscles of the face, arms, and legs and eventual loss of basic motor functions such as speech and swallowing.  Although long-term survival is possible, those afflicted can die within as few as three years from onset.

Glista, who had just changed jobs in the summer of 1999, filed a claim for long-term disability benefits with his new employer under its disability plan (the Plan), administered by Unum Life Insurance Company of America under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 <u>et seq.</u>  The Plan grants Unum, as plan administrator, discretion to determine eligibility for benefits and to interpret Plan provisions.  Unum found that Glista was disabled but denied his claim on the ground that his PLS was a pre-existing condition and, hence, was within an exclusion from coverage.

This case requires that we address for the first time two questions of general import:  (a) the admissibility in ERISA cases of internal guidelines and training materials that interpret certain plan terms and are promulgated by the plan administrator; and (b) whether a plan administrator may defend a denial of benefits on the basis of a different reason than that articulated

-2-

to the claimant during the internal review process. We decline to adopt hard-and-fast rules as to either question. We conclude that such internal documents are admissible under certain conditions, which are met here. We also conclude that where a plan administrator articulates in litigation an additional reason for denial of benefits that differs from the reasons articulated to the plaintiff, reviewing courts have a range of options available. Here, we decline to consider the merits of the reason not articulated to Glista. Considering only the reason articulated to Glista, we conclude that the denial of benefits was arbitrary and capricious.

## I.

On June 30, 1999, Glista left his position as a senior sales director at PictureTel. His long-term disability coverage under PictureTel's Unum plan stopped that day. Fifteen days later, on July 15, 1999, Glista began work at Ezenia, Inc., as the vice president of worldwide sales, and started receiving long-term disability coverage under a different Unum plan, one for Ezenia employees (the Plan). His coverage under the Plan became effective on July 15, 1999.

The Plan provides that "[w]hen making a benefit determination under the policy, UNUM has discretionary authority to determine [the claimant's] eligibility for benefits and to interpret the terms and provisions of the policy." The terms of

the Plan provide coverage for claimants who are disabled for more than 180 days.  One is "disabled" if one is "limited from performing the material and substantial duties of [one's] regular occupation due to [one's] sickness or injury" and has "a 20% or more loss in [one's] indexed monthly earnings due to the same sickness or injury" (emphasis omitted).

The Plan, however, "does not cover any disabilities caused by, contributed to by, or resulting from . . . [a] pre-existing condition" (the Pre-Ex Clause).  The Plan states that:

> You have a pre-existing condition if:
>
> - you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to your effective date of coverage [the Treatment Clause]; or you had symptoms for which an ordinarily prudent person would have consulted a health care provider in the 3 months just prior to your effective date of coverage [the Symptoms Clause]; and
>
> - the disability begins in the first 12 months after your effective date of coverage.

The Plan's glossary defines "pre-existing condition" (the Glossary Definition) as

> a condition for which you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines for your condition during the given period of time as stated in the plan; or you had symptoms for which an ordinarily prudent person would have consulted a health care provider during the given period of time as stated in the plan.

-4-

Glista's coverage under the Plan began on July 15, 1999.  Hence, the three-month period to which the Plan refers (the Pre-Ex Period) was April 15, 1999 through July 15, 1999.

On April 23, 1999, during the Pre-Ex Period, Glista saw Dr. Anthony A. Pikus for a "slowly progressive" sense of "left lower extremity weakness" over the past several months, pain in his left heel and proximal lateral arm, and discomfort in his mid-back area.  Dr. Pikus prescribed Naprosyn for the pain and referred Glista to a neurologist.

On May 26, 1999, Glista saw Dr. David A. Kolb, a neurologist, who performed a neurological exam.  The exam revealed some weakness in Glista's foot and shoulder.  Dr. Kolb also noted a finding of hyperreflexia, observing that Glista's "reflexes [were] quite hyperactive and perhaps 7-8 beats of clonus [could] intermittently be elicited at the left ankle."  In addition, Dr. Kolb observed that Glista's left heel pain "does not have a radicular quality."  Dr. Kolb requested an electromyography test (EMG) of the left leg and left shoulder girdle to check for "any component of lower motor neuron involvement."  Primary lateral sclerosis (PLS), the disease with which Glista was ultimately diagnosed in January 2000, involves a purely upper motor neuron deficit.  (A. 561)

The EMG, which was done on June 8, 1999, revealed "[m]ild chronic reinnervation change, most likely in an L5 distribution."

-5-

In response, Dr. Kolb requested a lumbar and cervical MRI and prescribed Anaprox. The MRIs, conducted on June 15, 1999, showed conjoining of the left L5 and S1 nerve roots, a possible minimal mass effect on the left L5 nerve root, degenerative disc disease at L5-S1, and mild early osteoarthritis.

Seven days after the Pre-Ex Period ended, on July 22, 1999, Glista went for a follow-up visit with Dr. Kolb. Glista told Dr. Kolb that he was having difficulty walking. Dr. Kolb did another neurological exam, finding that Glista's deep tendon reflexes were "normoactive to slightly hyperactive" in Glista's upper extremities and "remain[ed] hyperactive in the lower extremities." Dr. Kolb concluded, "With [Glista's] hyperreflexia which I think is a fairly solid clinical finding and some very soft findings of functional weakness . . . , I think ongoing workup is mandated." He stated,

> I think Bernard probably has a left L5 or S1 radiculopathy that is responsible for his left leg numbness and left foot dorsiflexor weakness . . . . This is certainly supported by his MRI and EMG testing.
>
> The larger issue is his more global bilateral leg difficulties and hyperactive reflexes. My differential at this point includes structural/mass lesion of the thoracic cord, demyelinating disease, and motor neuron disease.

PLS is a type of motor neuron disease.

On August 19, 1999, an MRI of Glista's brain revealed "multiple punctate cerebral white matter lesions." When Glista returned to Dr. Kolb on September 17, 1999, Dr. Kolb reported that

he "need[ed] to look into the possibility of demyelinating disease but [would] also keep the possibility of neuron disease/primary lateral sclerosis in mind." This was the first time that any doctor had specifically mentioned the possibility that Glista had PLS.

Dr. Kolb reiterated PLS as a possible diagnosis at Glista's November 8 evaluation, although he thought that Glista's sensory symptoms made such a diagnosis "improbable." Dr. Kolb sent Glista to Dr. Allan H. Ropper, Chief Professor of Neurology at St. Elizabeth's Medical Center, for a second opinion. Dr. Ropper, who examined Glista on December 13, 1999, stated that "in closely reviewing the [brain] MRI, I think there are subtle lesions in the corticospinal tracts that suggest primary lateral sclerosis" (emphasis omitted). At Glista's January 19, 2000 evaluation, Dr. Kolb reported that his "working diagnosis" was "primary lateral sclerosis."

On February 6, 2000, Glista submitted a claim for long-term disability benefits under the Plan. Glista stated on the application form that the symptoms of his disabling condition, including "leg weakness, heel & shoulder pain, [and] lower back discomfort," began around January of 1999. On the attending-physician form submitted in support of Glista's claim, dated February 15, 2000, Dr. Kolb stated that he had diagnosed Glista with PLS. In response to the item marked "When did symptoms first

appear?" Dr. Kolb wrote "9/98." In a second supporting form, dated February 16, 2000, Dr. Kolb reiterated the diagnosis of PLS. In response to the item marked "Date of first visit for this illness or injury," Dr. Kolb wrote "5/26/1999."

Unum began an investigation into whether Glista was excluded from coverage under the Pre-Ex Clause. Glista's claim file was referred to Dr. Robert MacBride, an Unum Medical Director, who was asked whether Glista had a pre-existing condition. Dr. MacBride found that during the Pre-Ex Period, Glista had received "treatment" for a "condition" -- namely, "neurological [symptoms] forming [the] basis of Primary Lateral Sclerosis."

In a letter dated March 30, 2000, Heather Smith, a disability benefit specialist at Unum, informed Glista that his application for long-term disability benefits had been denied. Smith's letter stated, "Information gathered during our investigation supports that you were treated by Dr. Kolb on May 26, 1999 and June 8, 1999 for a condition which caused, contributed to, or resulted in the condition for which you are now claiming disability. Since this was within the [Pre-Ex Period], we must deny any liability on your claim."

Glista timely appealed on June 30, 2000, arguing that the treatment he received during the Pre-Ex Period was for L5 or S1 radiculopathy, not for PLS. He attached a letter from Dr. Kolb,

dated May 9, 2000, seeking to clarify the original attending-physician statement. Dr. Kolb's letter stated:

> Jim [Glista] has primary lateral sclerosis, a diagnosis that was established as a probable diagnosis only approximately in January of 2000.
> Previous investigation with an EMG in June of 1999 demonstrated abnormalities, however these abnormalities were not germane to what was subsequently proven to be his disabling disease, i.e. primary lateral sclerosis.
> Furthermore, while medical treatments of a general nature were used pursuant to Jim's EMG testing, these too were directed at pain related problems that are also, in retrospect, not felt to be related to his disabling diagnosis of primary lateral sclerosis.

In addition, Glista attached a letter from his primary care physician, Dr. Joseph F. Shalhoub, stating that when Dr. Pikus (who is an associate of Dr. Shalhoub's) saw Glista in April 1999, Glista's "symptoms were felt to be musculoskeletal and not related to his present condition."

On July 10, 2000, Unum had Dr. MacBride re-review Glista's claim. Dr. MacBride noted that Dr. Kolb had found hyperreflexia in his assessment of Glista on May 26, 1999, and that hyperreflexia "is a characteristic of upper motor neuron disease[s]" such as PLS and "would not be explained by radiculopathy." Dr. MacBride further noted that Dr. Kolb had not limited his differential diagnosis to radiculopathy at Glista's May 26, 1999 visit and had ordered tests that were "not limited to a possible collateral existence of radiculopathy." Dr. MacBride thus concluded that "[t]he evidence continues to indicate that the claimant was under treatment/investigation for an array of

-9-

neurological problems, the most critical of which was ultimately diagnosed as Primary lateral sclerosis."

Unum denied Glista's appeal in a letter dated July 24, 2000. The letter concluded that Glista was not covered because he had "received medical treatment, consultation, care and services including diagnostic measures" during the Pre-Ex period. The letter relied principally on Dr. Kolb's May 26, 1999 finding of hyperreflexia, noting that "[o]ur medical advisors indicate that bilateral hyperreflexia would not normally be a finding associated with radiculopathy." Glista's medical records, the letter stated, "confirm[ed] that [Glista] had neurological symptoms present and under investigation during [the] Pre-ex period which . . . indicate a concern for and ultimate relationship to" PLS.

Glista's claim was forwarded to Unum's Quality Review Unit for a second review. On September 26, 2000, Karen Van Deventer, an Unum appeals consultant, reviewed Glista's case file and forwarded it to neurologist Dr. Richard Sullivan. Van Deventer asked Dr. Sullivan to determine if "the treatment and diagnostic measures undertaken on 5/26/99, 6/8/99, 6/15/99 along with the EMG and MRI's clearly indicate a condition that caused, contributed to, or resulted in the disabling diagnosis of Primary Lateral Sclerosis." Dr. Sullivan called Unum to clarify "what determines if the condition is pre-existing." An Unum representative, after consulting Van Deventer, gave Dr. Sullivan the text of the Pre-Ex

Clause, including both the Treatment and Symptoms Clauses, but did not mention the definition of "pre-existing condition" in the Plan glossary. Dr. Sullivan responded that under the definition provided, Glista's condition was pre-existing. In a follow-up letter dated November 17, 2000, Dr. Sullivan stated, "Though the patient did not receive a definite diagnosis until December 1999 by Dr. Rop[p]er, clearly he sought medical attention for the symptoms which ultimately led to this diagnosis as early as April 1999. From April until December, his doctors were actively trying to diagnose his rare condition."

On November 21, 2000, relying on Dr. Sullivan's analysis and Dr. Kolb's finding of hyperreflexia during the Pre-Ex Period, Van Deventer informed Glista by letter that Unum was upholding the denial of his appeal on the ground that he "was treated during the pre-existing time period for the same symptoms, which ultimately led to his diagnosis of primary lateral sclerosis."

## II.

On February 2, 2001, Glista brought suit against Unum in federal district court for unlawful termination of his benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B).[1] Following discovery, Unum

---

[1] The complaint also included two other counts: (1) a claim that Unum had breached its fiduciary obligations under ERISA, 29 U.S.C. § 1132(a)(2), and (2) a claim that Unum had failed to provide copies of documents upon which it relied in denying Glista's benefits during the appeals process, 29 U.S.C. § 1332(c). Glista voluntarily withdrew the count based on breach of fiduciary duty. The district court ruled against Glista on the count based

-11-

moved for judgment on the administrative record on June 7, 2002, arguing that its denial of coverage could be overturned only if arbitrary and capricious and that the denial here did not meet that standard. Unum emphasized that the Plan contains no requirement that doctors or patients be aware of the correct diagnosis of the patient's illness during the Pre-Ex Period. Here, Unum argued, Glista had received treatment during the Pre-Ex Period for hyperreflexia, a symptom of PLS that, according to Dr. MacBride, could not be explained by radiculopathy. Unum contended that because Glista had received treatment for a condition, i.e., a set of symptoms including hyperreflexia and weakness in his extremities, that was caused by PLS, he was excluded from receiving benefits under Treatment Clause. Eventually, Unum additionally argued that Glista was also barred from benefits by the Symptoms Clause because he had symptoms of PLS for which an ordinary person would have sought treatment, as he ultimately did.

Glista opposed the motion, arguing that Unum's interpretation of the Plan was arbitrary and capricious. Glista argued that Unum could not rely on the Symptoms Clause because Unum had not relied on the Symptoms Clause in the internal review process and because the Symptoms Clause applied only when the claimant had not sought treatment. As for the Treatment Clause,

---

on failure to provide documents, and Glista has not challenged that ruling in this appeal.

-12-

Glista stressed that the Glossary Definition of "pre-existing condition" referred to a "condition for which [he] receive[d] treatment" (emphasis added). Glista contended that he could not have received treatment "for" PLS if he and his doctors were not aware that he had PLS. Further, he argued that even if the Pre-Ex Clause did not require awareness of his diagnosis or disabling condition, the treatment he received was "for" symptoms caused by radiculopathy, a condition not related to PLS. Although hyperreflexia was noted in his exam, Glista contends, Dr. Kolb's May 9, 2000 letter demonstrated that Dr. Kolb had ordered the EMG and MRI tests to address radiculopathy.

In addition, Glista moved on July 8, 2002, to include as part of the administrative record two documents (and related deposition testimony) that he had obtained, over Unum's objections, in discovery.

The first document was a set of excerpts from Unum's computer-based "risk management reference" guide, known as RIMARE, concerning the interpretation of pre-existing condition provisions. Van Deventer, who handled the second internal review of Glista's claim and who has sole discretion to approve or deny appeals of claims to which she is assigned, stated in her deposition that RIMARE is a tool used "to help with the analytical process of reviewing a claim." Although she could not recall when she was first pointed to RIMARE, she said that, at some point, she "was

informed to check [RIMARE] when processing appeals." Van Deventer stated, though, that she personally does not use RIMARE on an everyday basis in reviewing claims and, as of her deposition on March 18, 2002, had not referenced it in over a year. She could not recall whether she had used RIMARE when evaluating Glista's claim. Van Deventer also said that she received "hands-on training" on the use of RIMARE from a mentor who advised her "what systems to use and what systems to review or look at for information" when reviewing claims. She noted, though, that her training in RIMARE did not specifically address its use "with respect to the preexisting [condition] clause" and that she typically relies on attorneys when the appeal raises a legal issue concerning the proper interpretation of the policy.

In evaluating whether a Pre-Ex Clause applies, RIMARE states:

> [T]here must be a clear and direct relationship between the sickness or injury treated during the pre-existing period and that causing the insured to become disabled. A "possible" or "hypothetical" relationship is not a sufficient basis for denial of a claim.

RIMARE notes, though, that whether a condition has "manifested" itself during the Pre-Ex Period is "governed by the terms of the policy" and advises claims examiners to "[s]ee the specific terms of the particular contract, which can vary."[2]

---

[2] RIMARE also informs Unum's claims examiners of Unum's views on this court's ruling in <u>Hughes</u> v. <u>Boston Mut. Life Ins. Co.</u>, 26 F.3d 264 (1st Cir. 1994):

The second document that Glista sought to add to the administrative record was Unum's training materials on applying various pre-existing conditions clauses (the Training Materials). The Training Materials were created on March 9, 1999, and revised on May 27, 1999, before Glista's claim was filed. Van Deventer testified in her deposition that she encountered the Training Materials in a training course on long-term disability claims, but that this course occurred in August 2001, <u>after</u> she had handled Glista's claim.

The Training Materials state that in determining if a condition is pre-existing, claims examiners should apply the following standard:

> **If there is no record of treatment in the pre-ex period:**
>
> > ...
> >
> > If the claim is under a CXC policy which contains "prudent person" wording in the pre-ex provision, discuss the claim with a MCR to determine if an ordinarily prudent person would have consulted a health care provider in the pre-ex period for symptoms which the disabling condition was caused by, contributed to by or resulting from.

---

In this case, the court determined that an insurer (such as UNUM), in order to determine pre-x, needs to evaluate whether the physician and/or the claimant had knowledge during the pre-x period, that the treatment the insured was receiving was for the condition which is the cause of the disability. RIMARE states that <u>Hughes</u> affects "[a]ll ERISA Plans in the 1st Circuit, with the exception of CXC contracts. This is due to the fact that the language in our policies, except CXC, is almost identical to language in the Boston Mutual policy cited in the case." Here, the Plan is one of Unum's series CXC contracts.

> If yes, the disabling condition is pre-ex.
> If no, the disabling condition is not pre-ex.

**If there is a record of treatment in the pre-ex period**:

> Refer all medical records showing treatment in the pre-ex period to a MCR, asking if the treatment was for a condition which the disabling condition was caused by, contributed to by or resulting from.
>
> > If the MCR documents a clear link between the treatment in the pre-ex period & the disabling condition, the disabling condition is pre-ex.
> >
> > If the MCR does not establish a clear link between the treatment in the pre-ex period & the disabling condition, the disabling condition is not pre-ex.

In addition, the Training Materials instruct claims examiners to "[r]efer to RIMARE for more in-depth information on how to determine if a condition is pre-ex."

On September 30, 2003, the district court denied Glista's motion to include RIMARE, the Training Materials, and related deposition testimony in the administrative record. The court accepted Unum's argument that the discretion of a plan administrator could be fettered only by the language of the Plan itself, and not by any internal guidelines or interpretations. The court held that "by creating a training or a reference manual, Unum did not relinquish its discretion to interpret the terms of its own insurance policy." Both documents and the associated deposition testimony were therefore excluded for lack of relevance.

-16-

In the same order, the court also granted Unum's motion for judgment on the administrative record, finding that Unum's denial of coverage was not arbitrary and capricious. The court noted that it would have reached the same result even if it had included RIMARE in the administrative record. The court found Unum's interpretation of the Treatment Clause -- that the clause does not require the claimant or his physicians to be aware that the treatment was "for" the disabling condition -- to be reasonable. The court emphasized that the plain language of the Pre-Ex Clause did not require diagnosis or awareness of the disabling condition. Although contra proferentum ordinarily requires reading insurance contracts in favor of the insured, the court found that rule inapplicable here because the terms of the Plan expressly gave Unum discretion to interpret the Plan's provisions and decide Glista's eligibility for benefits.

The court then concluded that substantial evidence supported Unum's denial of benefits under either the Treatment Clause or the Symptoms Clause. Glista, the court found, had sought treatment and diagnostic services during the Pre-Ex period for a range of neurological symptoms that turned out to be caused by PLS and that were identified during the Pre-Ex Period as involving some form of neuron disease. The fact that Glista was also diagnosed as suffering from radiculopathy, the court concluded, "does not undermine the reasonableness of Unum's determination."

Glista timely appealed the order, challenging both rulings.

## III.

We turn first to Glista's argument that the district court erred in excluding RIMARE and the Training Materials as irrelevant. Unum contends that the documents are irrelevant as a matter of law because to admit them would be an impermissible constraint on the discretion of the plan administrator. Unum also argues that these documents are inadmissible because they are of the same category as those on which the court refused to allow discovery in Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19 (1st Cir. 2003). Both arguments overreach.

Liston was concerned with a different problem. It held that the district court had not abused its discretion in refusing to grant to a claimant who had been denied benefits discovery about other similarly situated claimants who did receive benefits. Id. at 25-26. Liston held that "[w]hether discovery was warranted depends in part on if and in what respect it matters whether others were better treated . . . and this is not a question that has a neat mechanical answer." Id. (emphasis in original). Liston was clear that "how others were treated could -- in some cases -- be substantively relevant" to the reasonableness of the plan administrator's decision. Id. But it concluded that such information was not relevant in Liston because "[t]he plan's

-18-

general standard is too vague and the variables in executive jobs are too numerous to expect that anyone else will be identically placed." Id. As a result, "discovery in such a situation would be [so burdensome as to be] at odds with the concerns about efficient administration that underline the ERISA statute itself." Id. at 26.

Liston is unlike this case in several respects. Liston involved an effort to put into the record facts about other persons that were not before the administrator. Here, by contrast, what is sought to be admitted are the plan administrator's own documents interpreting the language of the Plan and providing the standard for evaluation of the facts presented. The documents here are more analogous to an administrative agency's guidelines or regulations, which are routinely considered in evaluating whether the agency's actions were arbitrary or capricious. The documents here shed light on the "legal" rule the Plan applies, not the underlying facts presented to the Administrator.

Liston's concerns about burdening the plan administrator and allowing quick and efficient disposition of claims are also of considerably less weight here. RIMARE and the Training Materials are discrete documents easily made available.

Moreover, under new federal regulations, claimants are entitled to obtain copies of precisely such documents. ERISA requires that "[i]n accordance with regulations of the Secretary

-19-

[of Labor]," every employee benefit plan must provide participants whose benefits claims were denied with a "full and fair review" of the denial. 29 U.S.C. § 1133 (2003). In 2000, the Department of Labor promulgated regulations interpreting "full and fair review" to require that claimants be given access to all "relevant" documents. 29 C.F.R. § 2560.503-1(h)(2)(iii). Where the plan in question provides disability benefits, the Department of Labor defines "relevant" documents to include "statement[s] of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination." § 2560.503-1(m)(8)(iv). The Department indicated that these new regulations were intended to make clear that "the claimant should receive any information demonstrating that, in making the adverse benefit determination, the plan complied with its own processes for ensuring appropriate decisionmaking and consistency." 65 Fed. Reg. 70,246, 70,252 (Nov. 21, 2000).

Although these regulations apply only to claims made on or after January 1, 2002, 65 Fed. Reg. at 70,246, and thus do not apply to Glista's claim, the Department of Labor has made clear that the new regulations were intended to clarify the preexisting ones and that, in its view, the preexisting regulations already contemplated disclosure of such information. See 65 Fed. Reg. at

-20-

70,252. In addition, the new regulations reflect the Department of Labor's expert judgment that the benefits of making such information available to claimants outweigh the potential burdens on plan administrators.

The weight and admissibility of internal documents, whether those documents are offered in support of the interpretation of the plan administrator or that of the claimant, will vary with the facts of each case. See Doe v. Travelers Ins. Co., 167 F.3d 53, 57 (1st Cir. 1999). Such documents are most likely to be relevant where they have been authenticated, have been generated or adopted by the plan administrator, concern the policy in question, are timely to the issue in the case, are consistently used, and were known or should have been known by those who made the decision to deny the claim. Where a plan administrator has chosen consistently to interpret plan terms in a given way, that interpretation is relevant in assessing the reasonableness of the administrator's decision. The Department of Labor regulations state that claims procedures "will be deemed reasonable only if" they ensure that "plan provisions [are] applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5).[3]

---

[3] Although this regulation applies only to claims made after January 1, 2002, the Department of Labor emphasized that this interpretation of ERISA was based on a long-standing requirement of consistency. "Courts have long recognized that such consistency is required even under the most deferential judicial standard of

Contrary to Unum's arguments, we do not see a court's consideration of internal memoranda as impermissibly narrowing the discretion of plan administrators. By creating and promulgating internal guidance documents, plan administrators choose to exercise their discretion to define terms. When courts place weight on those definitions, they do not narrow the plan administrator's discretion beyond what the administrator itself has chosen to do.

There is nothing uncommon about reviewing courts considering such internal memoranda containing ERISA interpretations. For example, in Doe, this court considered internal guidelines upon which Travelers, the plan administrator, had relied in applying the mental health provisions of its plan. 167 F.3d at 59. We ultimately found the administrator's denial of benefits unreasonable, in part because that denial conflicted with Travelers' own guidelines. Id. Similarly, in Egert v. Conn. Gen. Life Ins. Co., 900 F.2d 1032 (7th Cir. 1990), the Court of Appeals for the Seventh Circuit relied on an internal memorandum in finding arbitrary and capricious the plan administrator's denial of a claim for in vitro fertilization on the ground that the plan authorized reimbursement only for the treatment of an "illness" and infertility was not an illness. Although the court found that "illness" could be credibly interpreted either to include or to exclude infertility, id. at 1037, it held that the denial was

review." 65 Fed. Reg. 70,246, 70,251 (Nov. 21, 2000).

-22-

arbitrary and capricious because "Connecticut General ha[d] described infertility as an 'illness' in its own internal guidelines," id. at 1038, which "outline[d] appropriate applications of the Plan to individual circumstances," id. at 1034.[4] The court stressed the importance of "uniformity of construction" when evaluating whether an action was arbitrary and capricious. Id. at 1037 (quoting Reilly v. Blue Cross & Blue Shield United of Wisc., 846 F.2d 416, 420 (7th Cir. 1988), which cites Dennard v. Richards Group, Inc., 681 F.2d 306, 318 (5th Cir. 1982)).

Here, RIMARE and the associated deposition testimony regarding its use are relevant to the interpretation of the Treatment Clause. In particular, RIMARE states that in applying "3/12" exclusions, i.e., those that, like the Pre-Ex Clause here, create a three-month Pre-Ex Period for disability claims made in the first twelve months of coverage, the Treatment Clause does not apply unless there is a "clear and direct relationship" between the condition treated and the disabling condition.[5] There is no

---

[4] The court stated that the internal guidelines were not "dispositive," but only in the sense that the interpretation adopted in those guidelines would not govern if it was unreasonable given the plan terms. See Egert, 900 F.2d at 1036.

[5] Glista also points to RIMARE's statement that under this court's decision in Hughes, "an insurer (such as UNUM), in order to determine pre-x, needs to evaluate whether the physician and/or the claimant had knowledge during the pre-x period, that the treatment the insured was receiving was for the condition which is the cause of the disability." We think that statement to be of limited

question as to RIMARE's authenticity or its use by Unum.[6]
Moreover, Van Deventer's deposition testimony establishes that
decisionmakers at Unum were instructed to consult RIMARE when
processing appeals and that RIMARE was in use when Glista's claim
was evaluated. Van Deventer, who made the decision to reject
Glista's appeal, received hands-on training on using RIMARE. The
fact that she does not remember if she actually relied on RIMARE in
evaluating Glista's claim does not undercut RIMARE's relevance.
See Cannon v. Unum Life Ins. Co. of Am., 219 F.R.D. 211, 214 (D.
Me. 2004) ("[I]f an internal memorandum existed that favored [the
claimant's] receipt of continuing benefits, the fact that it was
disregarded would be powerful evidence of an arbitrary and
capricious claims determination." (emphasis added)).

The Training Materials and the associated deposition
testimony regarding their use are relevant as well. In particular,

_____

relevance. RIMARE specifically notes that Hughes does not affect
CXC contracts of the sort at issue in this case. That notation
likely reflects the fact that the contract in Hughes, unlike CXC
contracts, did not reserve discretion to the plan administrator and
was therefore subject to de novo review. 26 F.3d at 267.

[6]     Unum argues that RIMARE is of limited relevance because
RIMARE states that claims examiners should consult the specific
terms of the policy at issue because RIMARE applies to many
different types of contracts. It is true that some provisions of
RIMARE, such as that governing whether a pre-existing condition has
"manifested" itself, refer examiners to the language of the
specific contract at issue. But RIMARE's requirement of a "clear
and direct relationship" between the pre-existing condition and the
disabling condition is not limited in any such fashion. And RIMARE
clearly states that the requirement applies to the particular type
of contract at issue here.

we note the relevance of the statement in the Training Materials that "[i]f the [medical review] does not establish a <u>clear link</u> between the treatment in the pre-ex period & the disabling condition, the disabling condition is not pre-ex" (emphasis added).[7]  The Training Materials indicate that this statement is intended to apply to pre-existing condition clauses of the 3/3/12 type in CXC contracts -- precisely the sort at issue here.  Van Deventer testified in her deposition that the Training Materials were used in Unum's training courses on the application of pre-existing conditions clauses, and the Training Materials indicate that they were created on March 9, 1999, and revised on May 27, 1999, before Glista filed his claim with Unum in February 2000.  Accordingly, we give the Training Materials some weight, as they reflect the plan administrator's interpretation of the Pre-Ex Clause at the time Glista's claim was evaluated.  We do not, however, give them as much weight as RIMARE because it is not clear that the decisionmakers in Glista's case knew or should have known of the Training Materials when evaluating Glista's claim.  Van Deventer said in her deposition that she herself did not receive training on using the Training Materials until after she had

_____

[7]    Glista argues that the Training Materials are also relevant because they demonstrate that the Symptoms Clause applies only when the claimant has not sought treatment.  We are not certain that the Training Materials go so far.  But we need not address the weight we place on this section of the Training Materials.  For reasons we discuss later, Unum is barred from relying on the Symptoms Clause in this litigation.

-25-

handled Glista's claim, and there is no evidence that any of the other decisionmakers in Glista's case received such training.

## IV.

We turn next to Glista's challenge to Unum's denial of benefits. Our review of the district court's grant of judgment on the administrative record is de novo. See, e.g., Spangler v. Lockheed Martin Energy Sys., Inc., 313 F.3d 356, 361 (6th Cir. 2002). Where, as here, a plan administrator has discretion to determine eligibility for and entitlement to benefits, the district court must uphold the administrator's decision "unless it is arbitrary, capricious, or an abuse of discretion." Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 212-13 (1st Cir. 2004) (internal quotation marks omitted). The fact that Unum, the plan administrator, will have to pay Glista's claim out of its own assets does not change that standard of review. Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 418-19 (1st Cir. 2000).

On arbitrary and capricious review, Unum's decision will be upheld if the denial is reasonable and supported by substantial evidence. Gannon, 360 F.3d at 212-13. Here, Unum argues that it had two bases for denying benefits: the Treatment Clause and the Symptoms Clause. We take up each in turn.

## A.        Treatment Clause

The Treatment Clause, as we have said, excludes coverage for disabilities beginning in the first year of coverage when the claimant "received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months just prior to [his] effective date of coverage" for a "condition" that caused, contributed to, or resulted in his disability.  RIMARE states that the Treatment Clause applies only when there is "a clear and direct relationship between the sickness or injury treated during the pre-existing period and that causing the insured to become disabled."  RIMARE specifically states that "a 'possible' or 'hypothetical' relationship is not a sufficient basis for denial of a claim."  The Training Materials further require "a clear link between the treatment in the pre-ex period & the disabling condition," stating that without such a link, "the disabling condition is not pre-ex." In short, under Unum's interpretation as articulated in RIMARE and the Training Materials, the Treatment Clause applies only where there is a clear and direct relationship between the symptoms and treatment in the Pre-Ex Period and the disabling condition (here, PLS).

Even assuming arguendo, in Unum's favor on both assumptions, that the Treatment Clause itself contains no awareness requirement and, further, that the term "condition" can refer to an

-27-

array of symptoms,[8] the Treatment Clause, as applied in RIMARE and the Training Materials, does not provide a reasonable basis for denying Glista's claim. Six events occurred during the Pre-Ex Period: (1) Glista's April 23, 1999 visit to Dr. Pikus, a general practitioner; (2) Dr. Pikus's prescription of Naprosyn; (3) Glista's May 26, 1999 visit to Dr. Kolb, a neurologist; (4) an EMG test on June 8, 1999; (5) lumbar and cervical MRIs on June 15, 1999; and (6) Dr. Kolb's prescription of Anaprox. None of those events constituted treatment that was both itself clearly linked to PLS and addressed to symptoms clearly linked to PLS.

Glista's visit to Dr. Pikus concerned complaints of left leg weakness and heel pain, lower back pain, and arm pain. The record does not support a "clear and direct relationship" between those symptoms and PLS. It is undisputed that Glista suffered from radiculopathy during the Pre-Ex Period and that those symptoms were consistent with radiculopathy. Unum concedes in its brief that Dr. Kolb's diagnosis of radiculopathy was correct, albeit, in Unum's estimation, "incomplete." The evidence of record is that, to the extent any clear and direct link existed between any illness and the symptoms experienced by Glista when he visited Dr. Pikus, it

---

[8] The parties disagree over whether the text of the Treatment Clause requires the claimant and his treating physicians to be aware that he suffers or could be suffering from the disabling condition. They also disagree over whether the term "condition" can refer to an array of symptoms or whether it refers only to a specific sickness or injury. We express no opinion on either dispute.

was between those symptoms and radiculopathy, not PLS. Indeed, even after Glista had been diagnosed with PLS, Dr. Kolb's assessment was that Glista's "pain related problems" during the Pre-Ex Period were "not felt to be related to his disabling diagnosis of primary lateral sclerosis."[9]

Dr. Pikus's prescription of Naprosyn is similarly unhelpful to Unum. Dr. Pikus stated that he prescribed Naprosyn to treat Glista's arm, back, and heel pain, symptoms that did not have a "clear and direct relationship" to Glista's disabling condition of PLS.

Glista's May 26, 1999 visit to Dr. Kolb did uncover a symptom of PLS not consistent with radiculopathy: hyperreflexia. Dr. Kolb noted that symptom in his report but did nothing further about it during that visit. Unum argues that the mere fact of this notation constituted treatment with a clear and direct relationship

---

[9]     Unum points to Dr. Kolb's responses on two attending physician forms submitted in February 2000. Dr. Kolb indicated on the first form that the "[d]ate of first visit for this illness or injury" was May 26, 1999, and on the second form that "symptoms first appear[ed]" in September 1998. These statements are not sufficient to support a clear relationship between PLS and the symptoms of pain and weakness that Glista experienced during the Pre-Ex Period. Dr. Kolb's statement on the first form is most logically read to mean that Glista began in May 1999 the process that eventually uncovered PLS. Similarly, Dr. Kolb's statement on the second form that symptoms consistent with PLS began in September 1998 does not mean that those symptoms that occurred during the Pre-Ex period were clearly attributable to PLS. Dr. Kolb clarified his statements in a letter on May 9, 2000, stating that although Glista had since been diagnosed with PLS, Glista's pain-related symptoms during the Pre-Ex Period were related to other health problems (chiefly, radiculopathy) and not to PLS.

to PLS.  We disagree.  Notation of a symptom in a report does not constitute "treatment" for that symptom.  <u>Oxford English Dictionary</u> (2d ed. 1989) (defining "treatment" as "[m]anagement in the application of remedies; medical or surgical application or service").  Nor does it constitute "consultation" for that symptom. The Oxford English Dictionary defines "consult" as "to take counsel with; to seek advice from."  <u>Oxford English Dictionary</u> (2d ed. 1989).  The record does not indicate that Glista asked for or received advice about his hyperreflexia, or that Dr. Kolb even mentioned the symptom to Glista.  Moreover, mere notation of the symptom does not constitute a "diagnostic measure," much less one clearly linked to PLS.  A "measure" is a "plan or course of action intended to attain some object," <u>see</u> <u>Oxford English Dictionary</u> (2d ed. 1989).  Notation of a symptom, without further investigation of its causes, does not alone constitute a "plan or course of action" for arriving at a diagnosis of PLS.

Dr. Kolb did order several diagnostic measures in response to his examination of Glista.  But none of those measures was clearly linked to PLS.  First, Dr. Kolb ordered an EMG.  But Dr. Kolb described the EMG as a test for "lower motor neuron involvement," a point that has not been controverted by Unum's own medical experts.  <u>See</u> ALS Center at UCSF, Information About Diagnosis and Related Disorders, <u>available at</u> http://www.ucsf.edu/brain/als/diagnosis.htm    ("Electromyography

-30-

(EMG) is a test that is very sensitive in detecting lower motor neuron disease.")  Lower motor neurons run from the spinal cord to muscles.  See Gould Medical Dictionary 781 (1979).  PLS is a purely upper motor neuron, not lower motor neuron, disease.  (A. 561)  Upper motor neurons are located in the motor cortex of the brain and run from the brainstem to the spinal cord.  See Gould Medical Dictionary 1428 (1979).

After the EMG, Dr. Kolb ordered lumbar and cervical MRIs, which produced images of Glista's lower back and neck, respectively.  See Gould Medical Dictionary 782, 252 (1979) (defining "lumbar" and "cervical").  Nothing in the record indicates that either MRI had any relation to PLS.  The cervical MRI report did mention Glista's hyperreflexia among other symptoms in his medical history, and Dr. Kolb later stated that the cervical MRI "checked both for [Glista's] hyperactive reflexes and some mild arm complaints."  But the cervical MRI report stated that its clinical concern was with "cervical myelopathy or demyelination."  Nothing in the record connects either of those conditions to PLS.  The only mention of either of those conditions in the record indicates that demyelination is a sign of multiple sclerosis, not PLS.  Indeed, as best the record shows, Dr. Kolb used the cervical and lumbar MRIs as tests for radiculopathy, a condition unrelated to PLS and described by Dr. MacBride in his deposition as involving pressure on nerve roots in the "cervical, thoracic or lumbar"

-31-

spine.  Dr. Kolb stated in the report of Glista's July 22, 1999 visit (after the Pre-Ex Period had ended) that a diagnosis of radiculopathy was "certainly supported by [Glista's] MRI and EMG testing."

Dr. Kolb's prescription of Anaprox following the MRIs does not trigger the Treatment Clause either.  Dr. Kolb's July 22, 1999 report indicates that he prescribed the drug to treat Glista's heel pain: "[Glista] complained of left heel pain . . . .  I placed him on Anaprox previously.  He did not have much of a response to this, but . . . [a]s he has become less active and more sedentary, his heel pain has abated quite a bit."  That pain, as we have mentioned, was not clearly linked to PLS.

Using Unum's own definition of the Treatment Clause, the decision to deny benefits under that clause was neither reasonable nor supported by the evidence.

**B.      Symptoms Clause**

Having determined that the denial of benefits cannot be justified under the Treatment Clause, we turn to Unum's reliance on the Symptoms Clause.  Glista argues, inter alia, that Unum should not be permitted to rely on the Symptoms Clause in litigation because it did not rely on that clause in its communications to him during the internal review process.  We agree.  Because we do not reach the question whether the Symptoms Clause would have been a proper basis for denying coverage if it had been raised earlier, we

-32-

do not address <u>Golden Rule Ins. Co.</u> v. <u>Atallah</u>, 45 F.3d 512, 517-18 (1st Cir. 1995), upon which Unum relies heavily in its discussion of the applicability of the Symptoms Clause.

Both the statute and the ERISA regulations require that the plan administrator provide a claimant with the specific reasons for its denial of a claim.  ERISA provides that:

> In accordance with regulations of the Secretary, every employee benefit plan shall . . . provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the <u>specific reasons</u> for such denial, written in a manner calculated to be understood by the participant . . . .

29 U.S.C. § 1133 (emphasis added).  The Department of Labor's implementing regulations require that the initial notice of a claim denial contain:

> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503-1(f) (2000).[10]  The regulations also require that decisions in subsequent internal appeals "include specific reasons for the decision, written in a manner calculated to be understood by the claimant, as well as specific references to the pertinent plan provisions on which the decision is based." § 2650.503-1(h)(3).

"[T]hese regulations are designed to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial." Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 689 (7th Cir. 1992); see also Terry v. Bayer Corp., 145 F.3d 28, 39 (1st Cir. 1998) (the purpose of 29 U.S.C. § 1133 and its implementing regulations is to ensure "a sufficiently clear understanding of the administrator's position to permit effective review" (internal quotation marks omitted)).

The regulations also further the overall purpose of the internal review process: "to minimize the number of frivolous lawsuits; promote consistent treatment of claims; provide a nonadversarial dispute resolution process; and decrease the cost and time of claims settlement." Powell v. AT&T Comm., Inc., 938 F.2d 823, 826 (7th Cir. 1991); see also Makar v. Health Care Corp.

---

[10]  Additional requirements were added to this regulation in 2000, see 29 C.F.R. § 2560.503-1(g), but those amendments apply only to claims made after January 1, 2002, see 65 Fed. Reg. 70,246, 70,246 (2000), and hence do not apply to Glista's claim.

of the Mid-Atlantic (Carefirst), 872 F.2d 80, 83 (4th Cir. 1989); Short v. Cent. States, S.E. & S.W. Areas Pension Fund, 729 F.2d 567, 575 (8th Cir. 1984); Amato v. Bernard, 618 F.2d 559, 568 (9th Cir. 1980). Those goals are undermined where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary. Such conduct prevents ERISA plan administrators and beneficiaries from having a full and meaningful dialogue regarding the denial of benefits. See Juliano v. The Health Maint. Org. of N.J., Inc., 221 F.3d 279, 288 (2d Cir. 2000).

Glista argues that in Unum's communications to him during the internal review process, Unum never mentioned the Symptoms Clause as a reason for its denial and relied instead on the Treatment Clause alone. Unum denies this. Our review of the record supports Glista's characterization. ERISA requires denial letters to be "written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133. We have little doubt that a reasonable participant would have understood the denial to rest on the Treatment Clause alone.[11]

---

[11] Indeed, Glista's complaint and initial motions in the District Court focused only on the Treatment Clause. Unum first raised the Symptoms Clause, and not in its answer but only later in its opposition to Glista's attempt to obtain discovery regarding RIMARE and other internal documents relating to Unum's interpretation of the Pre-Ex Clause.

The first denial letter, dated March 30, 2000, quoted the entirety of the Pre-Ex Clause (including both the Symptoms and Treatment Clauses) but stated that Unum had denied coverage because "you were treated by Dr. Kolb on May 26, 1999 and June 8, 1999 for a condition which caused, contributed to, or resulted in the condition for which you are now claiming disability." That denial was plainly based on the Treatment Clause.

The second denial letter, dated July 24, 2000, did mention in its narrative of events that Glista had "neurological symptoms present and under investigation" during the Pre-Ex Period and that Glista's physicians recognized those "symptoms" as "significant and worrisome." But these statements were used to support the application of the Treatment Clause: the letter stated that "[t]his medical information [in reference to the narrative described above] clearly supports the fact that you received treatment, consultation, care and services including diagnostic measures in the 3 months prior to the effective date of insurance." Although the word "symptoms" was used, it was never connected to the Symptoms Clause or its requirements. No mention was made, for example, of whether an "ordinarily prudent person would have consulted a health care provider" for the symptoms described, as required under the Symptoms Clause.

The third and final denial letter, dated November 21, 2000, also mentioned the word "symptoms," but again in the context

of the Treatment Clause. The letter stated, "Glista was treated during the pre-existing time period for the same symptoms, which ultimately led to his diagnosis of primary lateral sclerosis. As a result, his disabling condition is the same condition for which he received treatment, and therefore, coverage for this claim is excluded." This denial was plainly based on the Treatment Clause. Again, although the word "symptoms" was used, no mention was made of the requirements of the Symptoms Clause, such as whether an ordinarily prudent person would have consulted a doctor for the symptoms described.

Unum argues that even if its letters to Glista did not rely on the Symptoms Clause, its own internal documents demonstrate that Dr. MacBride and Dr. Sullivan found Glista's condition to be pre-existing based on the Symptoms Clause as well as the Treatment Clause. Even assuming arguendo that Unum's characterization of those documents is correct,[12] internal documents cannot satisfy ERISA's requirement that the specific reasons for the denial be

---

[12]     We are not certain that this is the case. Unum cites an internal memorandum stating that "Medical review by Dr. MacBride indicates [employee] . . . had symptoms for which an ordinarily prudent person would have consulted a health care provider between 1/15/99 - 7/14/99." That quotation is misleading. The language in ellipses indicates that Dr. MacBride's actual finding was that Glista "received medical treatment, consultation, care or services including diagnostic measure[s] or took prescribed drugs or medicine, or had symptoms for which an ordinarily prudent person would have consulted a health care provider." There was no indication in that document that Dr. MacBride relied on the Symptoms Clause in finding that Glista had a pre-existing condition.

articulated to the claimant.  Indeed, Unum violated ERISA and its regulations by relying on a reason in court that had not been articulated to the claimant during its internal review.

That leaves the question of how a court should address the situation.[13]  In this context, no single answer fits all cases. See Lauder v. First Unum Life Ins. Co., 284 F.3d 375, 381 (2d Cir. 2002) (adopting a "case-specific" approach to these situations). Courts have adopted a variety of remedies.  Some courts have simply engaged in de novo, non-deferential review of the previously unarticulated reason.  Matuszak v. The Torrington Co., 927 F.2d 320, 322-23 (7th Cir. 1991); see also Gritzer v. CBS, Inc., 275 F.3d 291, 296 (3d Cir. 2002) (where plan administrator provided no reason for denial, reasons provided for the first time in litigation reviewed de novo); Mansker v. TMG Life Ins., 54 F.3d 1322, 1328 (8th Cir. 1995) (same).  Other courts have limited the grounds for decision to those articulated to the claimant by the plan administrator.  See Halpin, 962 F.2d at 696.

Some courts have held that the administrator waived defenses to coverage not articulated to the insured during the claims review process when the administrator had sufficient information to have raised those defenses if it so chose.  Lauder,

_____

[13]  This court has held, in other contexts, that mere procedural irregularities under the regulations do not automatically entitle plaintiff to benefits.  See Terry v. Bayer, 145 F.3d 28, 39 (1st Cir. 1998); Recupero v. N.E. Tel. & Tel. Co., 118 F.3d 820, 840 (1st Cir. 1997).

284 F.3d at 380-81; Marolt v. Alliant Techsystems, Inc., 146 F.3d 617, 620 (8th Cir. 1998); Pitts v. Am. Sec. Life Ins. Co., 931 F.2d 351, 357 (5th Cir. 1991).

By contrast, other courts have held that state common law doctrines of waiver have no place in review of ERISA claims, see White v. Provident Life & Accident Ins. Co., 114 F.3d 26, 29 (4th Cir. 1997), or that if such doctrines apply, they did not bar ERISA plan administrators, on the facts of those particular cases, from raising new bases for the denial of benefits in litigation. Farley v. Benefit Trust Ins. Co., 979 F.2d 653, 659-60 (8th Cir. 1992); Loyola Univ. of Chicago v. Humana Ins. Co., 996 F.2d 895, 901 (7th Cir. 1993); see also Juliano, 221 F.3d at 288 (waiver not applicable where new argument involves existence of coverage rather than application of policy conditions).

Still other courts have remanded to the plan administrator to consider new factual evidence or plan interpretations presented for the first time to the district court. See Vizcaino v. Microsoft Corp., 120 F.3d 1006, 1014 (9th Cir. 1997) (en banc) (new plan interpretation); Wolfe v. J.C. Penney Co., 710 F.2d 388, 393 (7th Cir. 1983) (new factual evidence). In our case, no new factual evidence has been submitted ab initio to the court.

We turn back to ERISA, the governing statute. On review of ERISA benefit claims, Congress gave the federal courts a range of remedial powers:

> A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a). We think that this power encompasses an array of possible responses when the plan administrator relies in litigation on a reason not articulated to the claimant.

Here, we conclude that several factors weigh in favor of barring Unum from raising the Symptoms Clause for the first time in this litigation. First, traditional insurance law places the burden on the insurer to prove the applicability of exclusions such as the Pre-Ex Clause. See 2 Law and Prac. of Ins. Coverage Litig. § 1.3 (describing as "well-settled" the rule that "the burden of proving that an exclusion defeats coverage rests with the insurer"); GRE Ins. Group v. Metro. Boston Hous. P'ship, Inc., 61 F.3d 79, 81 (1st Cir. 1995) (under Massachusetts law, insurer bears burden of proof on exclusions). Although background rules of state law are not controlling, they are reinforced here by ERISA's statutory command that the administrator articulate specific reasons for a denial of benefits. 29 U.S.C. § 1133; see also McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1205 (10th Cir.

1992) (ERISA insurer bears burden of proof in demonstrating applicability of exclusion); <u>Farley</u>, 979 F.2d at 658 (same).

Second, the Plan here expressly provides that participants "must receive a written explanation of the reason for the denial" of benefits. It states that "Unum will notify you [of a denial of benefits] in writing within 90 days after your claim form was filed" and that this "notice of denial shall include . . . the specific reason or reasons for denial with reference to those policy provisions on which the denial is based." The Plan also provides that in Unum's internal appeals process, "[t]he final decision on review shall be furnished in writing and shall include the reasons for the decision with reference, again, to those policy provisions upon which the final decision is based." Unum could hardly be caught by surprise by an insistence that it comply with its own plan.

Third, Unum, by claiming that it did raise the Symptoms Clause, has taken the position that it had sufficient information to raise the Symptoms Clause during the claims review process. No information was withheld from it. Indeed, in arguing in this litigation that the Symptoms Clause applies, Unum has relied exclusively on the administrative record created during the claims review process. Unum has offered no explanation for why it did not explain earlier to Glista that the Symptoms Clause was a basis for

the denial of benefits.  Congress intended ERISA insurers to speak clearly, in plain language, to plan recipients.

Fourth, Glista's medical condition calls for resolving this controversy quickly. Glista, who is unable to work, filed his application for benefits on February 6, 2000.  Almost two months later, his application was denied.  The administrative appeal process took nearly eight more months.  Litigation in the district court, unfortunately, added another thirty months.  As we write, it has been over four years since Glista applied for benefits.  PLS is degenerative and can be terminal.  Dr. MacBride, on reviewing Glista's medical file in March 2000, estimated that Glista had three to four years to live; Glista has already reached that point.

Under these circumstances, we think the "appropriate equitable relief" is to hold Unum to the basis that it articulated in its internal claims review process for denying benefits, i.e., the Treatment Clause.  We recognize that ERISA trusts plan administrators to make the first determination as to the availability of benefits and thus that remand may be appropriate in some, or even many, cases. But, given the countervailing concerns raised on the facts of this particular case, we do not find that to be the appropriate solution here.  Unum failed to raise the Symptoms Clause in the claims review process even though it had the burden, obligation, and opportunity to do so.  We simply do not know, had Unum raised the Symptoms Clause, what additional

information would have been provided to Unum by Glista or whether Glista would have settled his claim with Unum earlier.  In addition to driving up the cost of proceedings, Unum's failure may well have prevented a more efficient resolution of this case.

## **V.**

We **<u>reverse</u>** the grant of judgment in favor of Unum and hold that Glista is entitled to judgment.  We remand with instructions that an order be entered requiring Unum to pay the benefits that Glista seeks, including all benefits past due, with any interest to which he may be entitled.  Glista is awarded his costs.