Maureen K. SULLIVAN, Plaintiff,

v.

CAP GEMINI ERNST & YOUNG U.S., et al, Defendants.

No. 1:06CV00283.

United States District Court, N.D. Ohio, Eastern Division.

Oct. 11, 2007.

David B. Webster, Edward H. Chyun, Webster & Dubyak, Cleveland, OH, for Plaintiff.

James P. Baker, Virginia H. Perkins, Jones Day, San Francisco, CA, Jeffrey W. Saks, Jones Day, Cleveland, OH, Christopher A. Holecek, Angela M. Lavin, Wegman, Hessler, & Vanderburg, Cleveland, OH, Mark E. Schmidtke, Schmidtke Hoeppner Consultants, Valparaiso, IN, for Defendants.

### MEMORANDUM OPINION AND ORDER

SARA LIOI, District Judge.

Plaintiff Maureen Sullivan ("Sullivan") filed a complaint against Cap Gemini Ernst & Young U.S. ("Defendant or CGEY"), Unum Provident Corporation ("Unum"), and TBG Financial West ("TBG") (collectively "Defendants") in Cuyahoga County Court of Common Pleas on January 13, 2006, alleging wrongful denial of benefits and breach of fiduciary duty. Defendants removed the action to this Court on February 6, 2006, invoking federal question jurisdiction on the basis that the benefit plans under which Sullivan seeks recovery are governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* (Docket No. 1.) On April 7, 2006, Sullivan filed an amended complaint (Docket No. 11), restating her claims as causes of action under ERISA. This matter is now before the Court on cross-motions for summary judgment by Sullivan and Defendant CGEY. (Docket Nos. 41 & 48.)

### I. Statement of Facts

Sullivan began working at Ernst & Young in 1987. (Sullivan Aff. ¶ 2.) In 1996, she became a partner of the firm. (*Id.*) Ernst & Young sold its consulting division to CGEY in April 2000, and Sulli-

van became a shareholder and vice president of CGEY. (*Id.* ¶ 3.) As such, she participated in the CGEY Vice President Disability Program (the "VP Program"), which consisted of short-term disability plan ("STD Plan") and a long-term disability plan ("LTD Plan"). (Allard Decl. Ex. N.) TBG was the plan administrator. (*Id.*) The basic coverage provided replacement of 60% of the covered employee's base salary, up to a base salary of $600,000. (*Id.*) The VP Program also included optional "Buy Up" coverage, which would increase coverage to 80%, up to a base salary of $700,000, and also insured the employee's target incentive compensation. (*Id.*) Sullivan purchased the Buy Up coverage, and the premiums were deducted from her pay. (Sullivan Aff. ¶ 7.) In the event of total disability, Sullivan would be eligible to receive the tax-free equivalent of 80% of her pre-disability compensation, or $288,000 per year. The first 60%, or $228,000 per year, would come from two sources: (1) $78,000 per year from UNUM insurance policies purchased by CGEY; and (2) $150,000 per year directly from CGEY, which self-insured this portion of the LTD Plan. The remaining $60,000 per year would come from the Buy Up coverage, based on the UNUM policy purchased by Sullivan. (Ujczo Reply Aff. Ex. 7).

In July 2001, Sullivan began suffering from back, shoulder, and neck pain. (Sullivan Aff. ¶ 10.) On December 3, 2001, the pain forced her to take a leave of absence. (Allard Decl. Ex. A.) She applied for and received benefits under the STD Plan, receiving benefits equivalent to 100% of her pre-disability income. (*Id.*) On March 16, 2002, Sullivan returned to work at 65% of her normal schedule. (Gathers Decl. Ex. A.) By May 2002, she was working 75% of her normal schedule. (*Id.* Ex.B.)

The STD benefits expired in July 2002, and Sullivan applied for "Residual Disability" benefits under the LTD Plan. According to the terms of the LTD Plan, eligibility for Residual Disability benefits required that the claimant (1) be unable to either (a) perform one or more of the important duties of her occupation; or (b) perform the important duties of her occupation for more than 80% of the time normally required to perform them; (2) receive physician's care; and (3) not be Totally Disabled. (Allard Decl. Ex. M.) "Total Disability" was defined by the plan to mean that, due to injury or sickness, the claimant (1) was unable to perform the important duties of her occupation; (2) did not engage in any other gainful occupation; and (3) received physician's care. Sullivan's request for Residual Disability benefits was granted. (*Id.*) The Residual Disability benefits made up the difference between her pre-disability earnings and her earnings based on the reduced schedule.

In December 2002, Sullivan was informed that her employment with CGEY would terminate on December 31, 2002, as part of a reduction-in-force. (Gathers Decl. Ex. C.) Pursuant to the terms of her employment agreement, Sullivan received a lump-sum severance payment equal to six months' base salary, plus an additional payment in lieu of thirty days notice. (*Id.*) The termination letter, dated December 20, 2002, offered Sullivan enhanced separation benefits including (1) an amount equal to one month's salary; and (2) outplacement career counseling services in an amount not to exceed $10,000. In exchange for the enhanced benefits, Sullivan was required to execute a separation agreement and waiver ("Waiver"). (*Id.*)

A copy of the Waiver was forwarded to Sullivan by letter dated February 21, 2003. (*Id.* Ex.F.) The Waiver includes a release provision, which provides:

I understand that the consideration provided under this Agreement is being

given to me in exchange for my agreement to waive any claims I have or may believe I have against CGEY and the Releasees, as set forth below. I hereby release CGEY ... from all actions, cause of actions, claims, complaints, promises, agreements, charges, liabilities and/or damages of any kind, whether known or unknown, suspected or unsuspected, that I or my executors, administrators, assigns or heirs ever had, now have or may hereafter claim to have against the Releasees arising on or before the date this Agreement is executed by me (the "Waiver"). This Waiver includes, but is not limited to, any and all claims arising from, or in connection with, my employment with CGEY or my separation from this employment, including, but not limited to, any and all rights or claims: (a) for wages, commissions, bonus payments, stock grants or other forms of compensation; (b) arising under ... the Employee Retirement Income Security Act of 1974 ...; and (c) arising under any federal, state or local law or ordinance, tort, contract (express or implied), or any other obligation....

(*Id.* Ex.E.) The Waiver also includes an integration clause at paragraph 13:

This Agreement sets forth the entire agreement between CGEY and me regarding my separation from employment, and supersedes any and all prior understandings or agreements pertaining to my separation from employment, except as stated to the contrary herein and except for the post-separation provisions in my Employment Agreement, the Transaction Agreement and the Restricted Account Agreement, which survive the termination of my employment relationship.

(*Id.*) The last line of text in the Waiver states: "PLEASE READ THIS CAREFULLY. THIS AGREEMENT CONTAINS A WAIVER OF ALL EXISTING CLAIMS." (*Id.*)

The terms of the Waiver and the cover letter both stated that Sullivan had a period of forty-five days to consider its execution. The Waiver also recited that the recipient was advised by CGEY to consult an attorney prior to agreeing to its terms. (*Id.* Ex. E.) Sullivan did, in fact, consult with an attorney regarding the Waiver before signing it on March 12, 2003. (Sullivan Dep. 90:7–12, Feb. 8, 2007.) Pursuant to its terms, the Waiver also provided Sullivan a seven-day period in which to revoke her consent before it became effective. (Gathers Decl. Ex. E.) She did not do so.

The December 20, 2002 termination letter also included a statement regarding Sullivan's LTD coverage:

You will also be receiving information from TBG ..., which will include more detail about conversion of your Long Term Disability coverage. Your coverage under this plan will continue until February 28, 2003, however the insurance portion of the program is portable and may be continued, provided that you pay the required premium.

(*Id.* Ex. C.)

The subsequent letter from TBG, dated January 23, 2003, provided further information regarding Sullivan's LTD insurance policy:

Your disability policy purchased through the CGEY Vice Presidents Disability Plan provides you $11,500 in monthly tax-free income replacement in the event you are unable to work due to injury or sickness. CGEY will terminate payment of your premiums effective March 1, 2003. However, you have the option to continue your individual disability in-

surance (IDI) coverage after termination of firm paid premiums.

(Howorth Decl. Ex. A.)

On January 28, 2003, TBG provided Sullivan with copies of the Vice Presidents Disability Buy Up Program Brochure ("Program Brochure") and a Policy Summary. (*Id.*, Ex.B.) The Program Brochure stated: "both company purchased and individual Buy Up benefits are provided by individual policies which are fully portable with no change in premiums should you ever leave the company." (Allard Decl., Ex. N.) With regard to the cost of continuing coverage after separating from employment, the Program Brochure provided:

> If you should leave the Company at a future date, you will have the option of continuing both your Company insured and your Buy Up benefit. Your cost to maintain this coverage will be the same as it was while you were with the Company. Both the fixed cost for your younger age at date of purchase and the Company discount are guaranteed to be fully portable.

(*Id.*)

Following her termination from CGEY, Sullivan continued to receive Residual Disability benefits from UNUM through August 1, 2003. (Allard Decl., Ex. D.) On October 21, 2003, UNUM sent Sullivan a letter stating that she did not meet the definition of either Residual Disability or Total Disability under the LTD Plan. The letter provided, however, that,

> in order to be of service to you, we have decided to continue to pay your claim under the Residual Disability provision of your policy. We will continue to use your Current Monthly Income (CMI) as $20,125.00. Please note that these bene-

fits being provided to you will be provided on an extra-contractual basis.

(*Id.*, Ex.E.)

Approximately one year after her termination from CGEY, it became apparent to Sullivan that she could not obtain comparable employment in her area of expertise. She attributed this to the limitations imposed by her injuries. (Sullivan Aff. ¶ 21.) Sullivan's attending physician conducted a full physical capacity evaluation on or about January 8, 2004. (Aliard Decl. Ex. G.) The evaluation resulted in a determination that Sullivan was totally disabled from her former occupation. (*Id.* Ex.H.) Sullivan submitted a claim for Total Disability to UNUM by way of letter of March 10, 2004. (*Id.* Ex.G.) By letter dated June 30, 2004, UNUM granted Sullivan's request for total disability benefits under the LTD Plan, retroactive to December 30, 2003. (*Id.* Ex.I.) Since that time, Sullivan has received $11,500 in tax-free monthly payments from UNUM. (*Id.* Ex.K.) This amount includes the insured portion of the basic coverage, as well as the Buy Up coverage.

Sullivan attempted to contact CGEY to determine why she was not receiving payments from CGEY under the terms of the LTD Plan. (Sullivan Aff. ¶ 23.) She received no response. (*Id.* ¶ 23.) Eventually, Sullivan retained counsel, who wrote a letter dated July 18, 2005, to UNUM, TBG and CGEY stating Sullivan's belief that she was not receiving all benefits to which she was entitled, specifically that she was not receiving benefits pursuant to the Buy Up coverage. (Allard Decl. Ex. J.) Again receiving no response from CGEY[1], Sullivan instituted this lawsuit.

---

**1.** Both UNUM and TBG responded to the inquiry by stating that UNUM was paying the full amount of benefits covered by Plaintiff's policies. (Allard Decl., Exh. K.)

## II. Law and Analysis

### A. Standing

The Court must resolve the question of Sullivan's standing under ERISA as a threshold issue before reaching the merits of Sullivan's claims. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 118, 109 S.Ct. 948, 958, 103 L.Ed.2d 80 (1989). The parties do not dispute that the LTD Plan is an employee benefit plan as defined by ERISA. *See* 29 U.S.C. § 1002(1). Section 502(a)(1)(B) gives a participant or beneficiary the right to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The term "participant" is defined as "any employee *or* former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer ..., or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7). With respect to former employees, the Supreme Court has interpreted ERISA to provide standing only to those "who 'have ... a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits." *Firestone,* 489 U.S. at 117, 109 S.Ct. at 958 (*quoting Kuntz v. Reese,* 785 F.2d 1410, 1411 (9th Cir.))(*per curiam*), *cert. denied,* 479 U.S. 916, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986). A "colorable claim to vested benefits" is a reasonable claim that (1) a person will prevail in a suit for benefits; or (2) eligibility requirements will be fulfilled in the future. *Id.*

The Sixth Circuit, however, has made clear that "[i]n determining who is a 'participant,' for purposes of standing, the definition found in 29 U.S.C. § 1002(7) must be read in the context of traditional concepts of standing, not in the context of adjudicating the ultimate issue of the merits of the plaintiffs' claim.... Thus, while the Supreme Court's definition of 'participant' in *Firestone* guides our standing analysis, it is not necessarily dispositive." *Swinney v. General Motors Corp.,* 46 F.3d 512, 518 (6th Cir.1995) (citations omitted). "To satisfy Article [I]'s standing requirements, a plaintiff must show; (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Cleveland Branch, NAACP v. City of Parma, Ohio,* 263 F.3d 513, 523–24 (6th Cir.2001)(*quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000)).

■ CGEY asserts that Sullivan lacks ERISA standing because, according to CGEY, her participation in the LTD Plan ended upon termination of her employment, and she has no prospect of returning to covered employment. The Court rejects this assertion. CGEY's argument ignores standing based on a "colorable claim to vested benefits." Sullivan's claim for benefits arises, at least arguably, from an injury she suffered prior to her termination at a time when she indisputably was a plan participant. CGEY contends that Sullivan's participation ended upon her termination from employment, but that argument rests, in large measure, on the validity of the Waiver she executed at the time of her termination. While the Waiver may provide CGEY with a complete defense to Sullivan's claims, it does not bar her from bringing those claims in the first instance. If the Waiver were to divest Sullivan of standing, she would be deprived of a judicial forum for challenging

the Waiver's validity. Sullivan contends, for a variety of reasons, that the Waiver does not release her claims against CGEY. The Court finds that Sullivan's claim is indeed colorable because, if she is correct in her assertion that the Waiver does not bar her claims, she has, at the very least, a reasonable claim that she will prevail in a suit for benefits. Moreover, Sullivan's claim satisfies the traditional standing requirements, as she has suffered an actual and concrete injury in fact, fairly traceable to the actions of Defendants, which can be remedied by a decision in her favor. She therefore possesses standing to sue,

**B. Standard of Review**

Sullivan and CGEY have filed cross-motions for summary judgment on the denial of Sullivan's claim for long-term disability benefits. The Sixth Circuit has held it improper to resolve actions for wrongful denial of benefits under ERISA on motions for summary judgment. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir.1998). Under *Wilkins*, the Court must conduct a *de novo* review of the administrative record unless the plan gives the plan administrator discretion to determine eligibility or to construe the plan's terms. *Id.* If the administrator is granted discretion, an arbitrary and capricious standard applies. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989).

■ The procedure for obtaining such review in an ordinary denial of benefits case under ERISA, post-*Wilkins*, is by motion for judgment on the administrative record. This case, however, distinguishes itself from the ordinary wrongful denial of benefits case in several respects. Notably, there essentially is no administrative record to speak of regarding CGEY's denial of Sullivan's request for benefits under the LTD Plan. Most importantly for purposes of the instant motions is the fact that CGEY interposes the Waiver as a complete defense to Sullivan's claims. The Waiver is a contract. In contract actions, summary judgment may be appropriate when the documents and evidence underlying the contract are undisputed and there is no question as to intent. *Manley v. Plasti–Line, Inc.*, 808 F.2d 468, 471 (6th Cir.1987) (citation omitted). Normally, however, disputed issues of contractual intent are considered to be factual issues which preclude an award of summary judgment. *Id.* (citations omitted); *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir.1993). The summary judgment standard is a familiar one.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by af-

fidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

■ However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

■ Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Moreover,

"the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989), *citing Frito-Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.* It is against this backdrop that the Court considers the cross-motions for summary judgment filed by Sullivan and CGEY.

## C. Merits

In the ordinary ERISA wrongful denial of benefits case, the Court would begin its inquiry by determining whether Sullivan has exhausted her administrative remedies. As has already been explained, however, this is not such an ordinary case. CGEY does not contest Sullivan's disability. CGEY's chief argument is that, even if Sullivan would have been covered under the self-insured portion of the LTD Plan,[2] CGEY was released from liability for any such coverage by Sullivan's execution of the Waiver. Because of the dispositive nature of this asserted defense, the Court proceeds directly to the parties' arguments regarding the Waiver.

### 1. Choice of Law

The Waiver contains a choice of law provision, which states: "This Agreement

---

2. CGEY does not admit coverage for purposes of this motion, but its arguments in that regard—that Sullivan's claim is a new claim, rather than a pre-existing claim that pre-dates her termination—are not particularly compelling.

may be executed in separate counterparts, and shall be governed by the laws of the State of New York." (Gathers Decl., Ex. E, ¶ 12.) The choice of law provision notwithstanding, neither party urges application of New York law. Sullivan argues that federal common law controls the validity of a release where it involves a federal cause of action. CGEY contends, however, that state law governs enforcement of a release raised as a defense to a federal statute, and advocates application of Ohio law.

■ In determining which states' law applies in an ERISA case, the "analysis is governed by the choice of law principles derived from federal common law." *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir.2006). "In the absence of any established body of federal choice of law rules, we begin with the Restatement (Second) Conflicts of Law." *Id.*

Sullivan asserts that an established body of federal choice of law rules does exist, and provides that federal common law controls the validity of the Waiver in this case. Sullivan's assertion appears correct. "Federal common law controls the validity of a release of a federal cause of action." *Nicklin v. Henderson*, 352 F.3d 1077, 1080 (6th Cir.2003) (*citing Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (6th Cir. 1989)). The ERISA claims at issue are, of course, federal causes of action. The validity of the Waiver purporting to release those claims is therefore governed by federal common law.

### 2. The Waiver

■ Waivers of employee rights are "examined under normal contract principles unless overreaching or exploitation is inherent in the situation." *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1184 (6th Cir.1997). Under federal common law, the court first determines whether the contract is ambiguous as a matter of law.

*Anstett v. Eagle–Picher Indus., Inc.*, 203 F.3d 501, 503 (7th Cir.2000). If the agreement is integrated, the court may consider extrinsic evidence only to resolve any ambiguity in the agreement. *Id.* An ambiguous term is one that is subject to reasonable alternative interpretations. *Id.*

■ CGEY asserts that the terms of the Waiver unambiguously include Sullivan's claims in this case. The language of the release provision of the Waiver is very broad. It provides:

I hereby release CGEY ... from all actions, cause of actions, claims, complaints, promises, agreements, charges, liabilities and/or damages of any kind, whether known or unknown, suspected or unsuspected, that I ... now have or may hereafter claim to have against the Releasees arising on or before the date this Agreement is executed by me (the "Waiver"). This Waiver includes, but is not limited to, any and all claims arising from, or in connection with, my employment with CGEY or my separation from this employment, including, but not limited to, any and all rights or claims: (a) for wages, commissions, bonus payments, stock grants or other forms of compensation; (b) arising under ... the Employee Retirement Income Security Act of 1974 ...; and (c) arising under any federal, state or local law or ordinance, tort, contract (express or implied), or any other obligation....

(Gathers Decl., Ex. E.)

Sullivan contends that, the sweeping language of the release provision notwithstanding, her claims against CGEY for LTD benefits were preserved elsewhere in the Waiver. Sullivan points to paragraph 13, which provides:

This Agreement sets forth the entire agreement between CGEY and me regarding my separation from employment, and supersedes any and all prior

understandings or agreements pertaining to my separation from employment, except as stated to the contrary herein and except for the post-separation provisions in my Employment Agreement, the Transaction Agreement and the Restricted Account Agreement, which survive the termination of my employment relationship.

(*Id.*) This is the integration clause, which carves out certain other existing documents from its scope, and therefore permits, if appropriate, reference to such documents in interpreting the Waiver. Sullivan argues that the carve-out of her Employment Agreement from the integration clause removed her disability claims from the ambit of the Waiver because the Employment Agreement included a summary description of her disability benefits as an attachment. Sullivan does not provide a copy of the Employment Agreement or its attachments. Instead, she cites her own affidavit, in which she states, in part: "CGEY provided me with a copy of a plan description, which outlined the benefits of the disability coverage. This plan description was attached to my employment agreement with CGEY, which I received in or about April of 2000." (Sullivan Aff. ¶ 5.) CGEY did provide the Court with a copy of Sullivan's Employment Agreement, though it does not include copies of the attachments. (Gathers Decl., Ex. D.) CGEY contends that the plan description, which Sullivan states was attached to the Employment Agreement, was not, in fact, so attached. If it was not, Sullivan's argument that the exception of the Employment Agreement from the integration clause excludes her disability claims from the scope of the Waiver fails completely. Examination of the language of the Employment Agreement indicates that it had four attachments, referred to in the text as Annex I through Annex 4. Annex 1 concerned confidentiality of private infor-mation, Annex 2 concerned noncompetition covenants, Annex 3 concerned CGEY's intellectual property policy, and Annex 4 concerned arbitration and judicial enforcement of the Employment Agreement. The Employment Agreement makes no mention of disability benefits.

As a release of all claims against CGEY, known or unknown, arising on or before its execution, including any and all claims arising under ERISA, the Court finds it impossible to read the release provision of the Waiver to exclude the claims asserted by Sullivan in her First Amended Complaint. It would be illogical to find that the integration clause preserves Sullivan's claims by reference to the Employment Agreement where the release terms are unambiguous, even if the plan description was attached to the Employment Agreement (an allegation the Court finds dubious). The extrinsic evidence cited by Sullivan, namely the plan description, is at best appropriately considered an aid to the Court in its interpretation of the meaning of the Waiver. Even if this apparent factual dispute is resolved in Sullivan's favor, and the plan description was attached to the Employment Agreement, use of the plan description to aid interpretation of the release provision of the Waiver still leads the Court to conclude that the Waiver was intended to act as a complete release. A contract is considered ambiguous where the parties suggest different, yet reasonable interpretations. *Cmty. Heating & Plumbing Co., Inc. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993), The Court finds the interpretation offered by Sullivan—that the reference in the integration clause to Sullivan's Employment Agreement excepted her claims from the release—to be unreasonable. Sullivan's protestation to the contrary notwithstanding, the Court finds that the Waiver unambiguously releases Sullivan's ERISA claims in this case.

Summary judgment ordinarily is appropriate in a contract action when the language of the contract is unambiguous, or, if the language is ambiguous, where extrinsic evidence leaves no genuine issue of material fact and permits interpretation of the agreement as a matter of law. *See UAW Local 540 v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir.1999). Sullivan nevertheless contends that, even if the terms of the Waiver unambiguously release her claims, it is unenforceable because it was not made knowingly and voluntarily. To be valid, a waiver must be knowingly and voluntarily made. *Shaheen v. B.F. Goodrich Co.*, 873 F.2d 105, 107 (6th Cir.1989). The Court has its doubts about whether further resort to extrinsic evidence is appropriate where the terms of the agreement are unambiguous. Sullivan's position, however, finds some support in Sixth Circuit law. Courts in the Sixth Circuit look at several factors to determine whether a release of a federal cause of action was made knowingly and voluntarily: (1) the employee's experience, background and education; (2) the amount of time the employee had to consider the release, including whether the employee had time to consult an attorney; (3) the clarity of the release's language; (4) the consideration received for the release; and (5) the totality of the circumstances. *Nicklin v. Henderson*, 352 F.3d 1077, 1080 (6th Cir.2003) (*citing Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995))(*But see Astor v. Int'l Bus. Machs.*, 7 F.3d 533, 540 (6th Cir.1993)) (applying Ohio law to contracts in ERISA case, not employing five-factor analysis to releases and finding resort to parol evidence inappropriate).

Application of the five-factor analysis, with reference to the extrinsic evidence offered by Sullivan, does not alter the Court's conclusion that the Waiver acts as a valid, enforceable release. Of the five relevant factors, four weigh heavily in favor of upholding the release, even when viewed in the light most favorable to Sullivan. Sullivan, a Vice President and shareholder of CGEY, was, by her own admission, a "nationally respected consultant with considerable expertise and earning power." (Pl.'s Br. Summ. J. 3.) Sullivan is a well-educated and sophisticated businessperson with significant professional experience. Sullivan was given a period of forty-five days to consider whether to sign the Waiver, and was counseled by CGEY to consult an attorney in doing so. Sullivan did in fact speak with an attorney prior to signing the release. After signing the Waiver, Sullivan was provided a seven-day period to revoke the Waiver before it became effective. She was aware of her revocation rights, but declined to do so. The language of the release is clear in encompassing all claims against CGEY, and explicitly includes claims under ERISA. In exchange for executing the release, Sullivan received a cash payment of approximately $20,000 (the equivalent of one months' salary) plus outplacement counseling services valued at approximately $10,000. This was in addition to the six months' severance pay to which Sullivan was entitled under her Employment Agreement

Sullivan's main argument that the Waiver was not entered into knowingly and voluntarily falls entirely under the "totality of the circumstances" factor. In support of this contention, Sullivan offers several emails between and among various employees of the different defendants in this case. Sullivan specifically directs the Court to email correspondence between CGEY's Director of Health Benefit & Welfare Plans, Tracey McGee, and TBG's Senior Director of Client Services, Charlotte Ellevold, as the "most compelling evidence that the parties intended to preserve Ms. Sullivan's disability benefits." (Pl.'s Br. Summ. J. 15.) This email from McGee to

Ellevold, dated December 16, 2003, states, in pertinent part:

> John (from UNUM), indicated below that they needed a reason for the termination in order to better assess the impact to her eligibility for continued disability benefits. Could you provide this information to them and reconfirm whether they can provide a more concrete answer? We want to ensure that we do the right thing for Maureen and not do anything that may jeopardize her LTD partial benefits.

(Ujczo Summ. J. Aff. 5.)

The remainder of the emails attached to the Ujczo Affidavit in Support of Plaintiff's Motion for Partial Summary Judgment (none of which are referred to by Sullivan in her brief), appear to be irrelevant to the issue of whether the Waiver entered into by Sullivan and CGEY was knowing and voluntary. With one exception,[3] these are messages involving employees of UNUM and TBG, neither of which was party to the Waiver. Accordingly, these emails cannot possibly evidence the knowledge or intent of Sullivan or CGEY with regard to the Waiver, given the obvious fact that neither party to the Waiver had any knowledge of their existence.

These emails make up the universe of objective evidence contemporaneous to the execution of the Waiver[4] from which Sullivan would have the Court infer that both she and CGEY intended her disability claim to survive the Waiver. Sullivan also offers her own declaration that she executed the Waiver "only after [she] confirmed [her] understanding that this agreement would not require [her] to release any of [her] claims related to [her] existing disability claim," (Sullivan Aff. ¶ 17.) Sullivan claims that she "specifically confirmed this understanding" with CGEY prior to signing the Waiver, and that she would not have signed it had she believed that it required her to relinquish the disability claim. (Id. ¶¶ 18–19.) Sullivan's own affidavit, even when viewed in the light most favorable to her, supplies only evidence of her intent regarding the Waiver. The Court can glean nothing at all regarding CGEY's intent with regard to the Waiver. This evidence of Sullivan's intent, as far as it goes, serves only to highlight the fact that she understood the import of the Waiver and its potential impact on her disability claims. That someone of Sullivan's sophistication, assisted by counsel, could possess an understanding that the Waiver did not impact her disability claims where the specific language of the document evidences no effort whatsoever to create an exception for such claims, is rather astounding. But it does nothing to persuade the Court that, in light of the Waiver's unambiguous language, both parties nevertheless intended to create an exception for disability claims without bothering to mention the supposed exception.

For the Court to find that a genuine issue of material fact exists as to whether Sullivan entered into the Waiver knowingly and voluntarily, based solely on the totality of the circumstances factor, the evidence on that factor would have to be compelling, given that the other four factors indisputably weigh in favor of uphold-

---

**3.** The sole exception is another email between McGee (a CGEY employee) and Ellevold dated December 4, 2002. (Ujczo Aff. 8–9.) The contents of this email do not mention a waiver or release of any kind, and do not evidence any intention on the part of CGEY to remain liable for Sullivan's disability claims after her termination. Furthermore, the email predates Sullivan's termination by several weeks, and predates the execution of the Waiver by more than three months.

**4.** In the Ujczo Reply Affidavit, Sullivan offers additional email correspondence, none of which occurred at or around the time the parties executed the Waiver.

ing the Waiver. It is not. The totality of the circumstances does not indicate that Sullivan lacked knowledge of the substance of the Waiver. At best, she was operating under the mistaken assumption that it did not release her disability claims. As explained *infra*, such a mistake will not invalidate the Waiver. The evidence does not support an inference that CGEY shared Sullivan's misconception. Viewing what the Court perceives as the Waiver's clear, unambiguous language, the long period of time Sullivan was given to consider its terms, the fact that she was encouraged to and (rather astonishingly) did, in fact, consult an attorney before signing, was given a week to reconsider the Waiver before it became effective, and was paid approximately $30,000 in valuable consideration, the Court is compelled to conclude that no genuine issue of material fact exists as to whether the Waiver was executed knowingly and voluntarily.

Courts have upheld the validity of releases as a bar to a plaintiff's claims at the summary judgment stage based on facts significantly more compelling for the plaintiff, in this Court's opinion, than those in this case. *See, e.g., Sako v. Ohio Dept. of Admin. Servs.*, No. 206–0728, 2007 WL 1500905, at *7 (S.D.Ohio May 21, 2007); *Kendrick v. Kmart Corp.*, No. 99–73367, 2000 WL 246582 (E.D.Mich. Feb. 25, 2000); *contrast Walker v. Ryan's Family Steak Houses*, 400 F.3d 370, 381 (6th Cir.), *cert. denied*, 546 U.S. 1030 126 S.Ct. 730, 163 L.Ed.2d 567 (2005). In *Sako*, the employee signed a waiver of all claims arising out of a grievance with his employer in exchange for a payment of $6,500. *Sako*, 2007 WL 1500905, at *1. The settlement notwithstanding, the plaintiff filed suit in federal court under Title VII alleging discrimination based on national origin. *Id.* at *2. The defendant moved for summary judgment, alleging that the suit was barred by the terms of the settlement. *Id.* In response, the plaintiff argued that the settlement was unenforceable because it lacked consideration and was not entered into knowingly and voluntarily. *Id.* The court employed the five-factor analysis from *Adams*. Sako was an immigrant to the United States from Africa. At the time he immigrated, he spoke only French. He had since completed the equivalent of a high school education, but had no formal training in business or law. *Id.* at *5. The settlement agreement was presented to him just minutes before he was required to sign it. He did not, and was not encouraged to, seek the advice of counsel. At the time he signed the agreement, he was in dire financial need. *Id.* at *6. The court nevertheless found that Sako knowingly and voluntarily waived his right to sue the employer for any damages arising from his termination. *Id.* at *7. The language of the settlement was clear, concise and unequivocal. Regarding the plaintiff's lack of counsel in reviewing the agreement, the court noted the absence of any allegation that the "defendant prevented him from consulting with an attorney or told him he could not do so." *Id.* The court conceded the brevity of the time period that Sako was given to contemplate the agreement's terms before signing, but concluded, based on the totality of the circumstances, that he "was aware of the waiver's legal consequences and ramifications." *Id.*

In *Kendrick*, the court upheld a release of ADEA claims signed by the employee. *Kendrick*, 2000 WL 246582, at *4. Such a waiver is subject to the heightened protections provided by the Older Workers Benefit Protection Act, 29 U.S.C. § 626(f) ("OWBPA"). The plaintiff was a Kmart manager with twenty years' experience. Though he was offered forty-five days to consider the waiver, the plaintiff testified that he signed it the same day it was offered, without obtaining the advice of counsel and without even reading the document. *Id.* at *3. The court concluded

that the plaintiff had knowingly and voluntarily accepted the agreement, the language of which was clear. *Id.* at *4. The court noted that Kendrick had a sufficient period of time to consider the offer despite the fact that he declined to use it, and had been advised to consult an attorney. *Id.*

In contrast to *Sako, Kendrick,* and this case, *Walker* exemplifies a case where application of the five-factor analysis compelled the conclusion that an agreement was not executed knowingly and voluntarily. In *Walker,* all job applicants to the defendant employer were required to sign an agreement to arbitrate employment disputes as a precondition to submitting the application. *Walker,* 400 F.3d at 373. Failure to accept the arbitration agreement purportedly terminated the application process. *Id.* The defendant asserted the arbitration agreements as a defense to a multi-plaintiff complaint for violation of the Fair Labor Standards Act, ("FLSA"), 29 U.S.C. § 201–219. *Id.* at 373. The district court invalidated the agreements as, *inter alia,* not executed knowingly and voluntarily. *Id.* at 381. The Sixth Circuit affirmed. *Id.* The typical applicant was not a high school graduate, and the salary range for the positions was between $11,000 and $16,000 per annum. *Id.* The applicants typically were hired on the spot after a brief interview, and were instructed to sign the arbitration agreements, among many other documents, without any explanation, in order to be considered for a position. Id. at 381–82. The applicants had no time to consider the agreements, were not instructed to consult an attorney,

and were not afforded any revocation period. *Id.* at 382.

The facts of the instant case do not approach those of *Walker.* The Court finds Sullivan's argument that she did not execute the Waiver knowingly and voluntarily less compelling than similar arguments presented in *Sako* and *Kendrick,* where the district courts, applying the same analysis, upheld the releases.

■■■ An otherwise valid agreement may be invalidated due to fraud, duress, coercion or mistake.[5] *Howlett v. Holiday Inns. Inc.,* 120 F.3d 598, 601 (6th Cir. 1997). Sullivan has not alleged fraud, duress or coercion. By arguing that both Sullivan and CGEY intended to preserve her disability claim in the Waiver, Sullivan is perhaps alleging mutual mistake. Extrinsic evidence is always admissible to show that there has been a mistake in reducing the agreement of the parties to writing. *Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1295 (6th Cir.1991). Viewing the evidence in the light most favorable to Sullivan, she appears to have been under the mistaken impression that the Waiver did not affect her existing disability claim. There is no evidence to suggest, however, that CGEY intended to except Sullivan's disability claims from the scope of the Waiver. Sullivan's mistake was unilateral, and unilateral mistakes are insufficient to set aside an agreement. *Nicklin,* 352 F.3d at 1081. It may be that, at the time the Waiver was executed, neither party specifically contemplated the situation that has now arisen, where Sullivan is

---

**5.** An agreement invalidated for one of these reasons can also be ratified by retention of the consideration paid after the fraud, duress, coercion or mistake is uncovered. *Howlett,* 120 F.3d at 601. CGEY contends that the ratification principle applies in this case because Plaintiff has retained the funds paid in consideration for the Waiver. Although not relevant to the disposition of this case, the

Court disagrees. Plaintiff was not informed by CGEY that it intended to rely on the Waiver as the basis for denying her claim until after litigation had begun. It would be unreasonable to apply ratification under such circumstances where the culpability for the delay in communicating the basis for the denial rests with CGEY.

totally disabled and seeks the full amount of benefits available under the LTD Plan. At the time, Sullivan was only partially disabled, and was completely covered for that disability by one of the UNUM policies. But contemplation and understanding of all conceivable claims encompassed by the release is not required. Under applicable law, as explained *supra*, what is required to uphold the Waiver is a finding that it was entered into knowingly and voluntarily by Sullivan. For the reasons stated previously, the Court finds that no genuine issue of material fact exists on this issue.

It is at least questionable whether an individual can prospectively release ERISA claims that accrue after the release is executed. *See Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 317 (4th Cir.2001); *Wright v. Southwestern Bell Tele. Co.*, 925 F.2d 1288, 1293 (10th Cir. 1991). Sullivan does not pursue this issue, and in fact asserts that her claim arose prior to the execution of the Waiver. (Pl.'s Reply 11.) The issue bears mention, however, given the position taken by CGEY that Sullivan's claim is a "later claim" the post-dates her termination. (CGEY Reply 12.) The Court concurs with Sullivan that her claim "was not frozen in time" and that the change from partial to total disability did not "trigger a new claim or a new inception date." (Pl.'s Reply 11.) The claim under which Sullivan now seeks benefits is a single claim arising from the same disability for which Sullivan sought and received benefits while employed with CGEY. Unfortunately for Sullivan, that means that the Waiver she executed, in which she agreed to release any and all claims relating to her employment, including those under ERISA, and which the Court finds was entered knowingly and voluntarily, bars her from receiving the benefits she seeks.

### 3. Failure to Assert Waiver as a Defense Prior to Litigation

Sullivan contends that CGEY is precluded from asserting the Waiver as a bar to her claims because it failed to inform her of this defense prior to litigation. Sullivan cites *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 128 (1st Cir.2004) and *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 244 (1st Cir.2006). In *Glista*, the First Circuit Court of Appeals held that the defendant was barred from asserting the "symptoms clause" in the plan as a basis for denial of benefits because it did not rely on that clause in communications to the plaintiff during its internal review of the plaintiff's claim. *Glista*, 378 F.3d at 128. In explaining the rationale for its decision, the First Circuit noted that the ERISA statute and regulations require a plan administrator to provide a claimant with specific reasons for denying a claim. *Id.* The reasons for providing such an explanation are several: to ensure meaningful review of the claim denial; to minimize the number of frivolous lawsuits, promote consistent treatment of claims, provide a nonadversarial dispute resolution process, and decrease the cost and time of claims settlement. *Id.* at 129. The First Circuit found that those goals were "undermined where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary. Such conduct prevents ERISA plan administrators and beneficiaries from having a full and meaningful dialogue regarding the denial of benefits." *Id.* The court concluded that an appropriate remedy for defendant's failure to comply with ERISA's mandates regarding claim denial was to hold the defendant to the basis for denial articulated in its internal claims review, and bar it from asserting the symptom clause, which was

not raised until after litigation had begun. *Id.* at 132.

*Bard* is similar to *Glista.* The plaintiff former employee applied to defendant pension plan for disability benefits. *Bard,* 471 F.3d at 231. The plan's board of trustees determined that the plaintiff was unable even to apply for a disability pension based on its reading of a prior arbitration decision. *Id.* at 232. The plaintiff was not informed of the board's decision to deny benefits ·(in contravention of established regulations), but the plaintiff eventually found out about the decision, though not necessarily its reasoning, and took an administrative appeal. *Id.* The board heard the appeal, which also violated regulations. *Id.* at 233. The plaintiff then submitted another claim along with evidence establishing his disability. Some of the information he submitted was not intended to address whether his disability arose while he was still employed, because the plaintiff had not been informed of the basis for the board's decision, and that evidence later proved harmful to his administrative appeal. *Id.* at 241. The board considered his application, deadlocked, and then waited, violating applicable time limits. *Id.* The plaintiff retained counsel, requested discovery, and the board finally disclosed to him that its initial denial was based on an interpretation of the plan that required him to establish that he was completely disabled while still employed, even though the plan language did not explicitly so require. *Id.* at 233–34. The plaintiff submitted more evidence, including evidence to support his claim that he was disabled prior to termination. The board considered the application, deadlocked again, and submitted the matter to arbitration. *Id.* at 234. The frustrated plaintiff filed suit in federal court. Meanwhile, the arbitrator found that plaintiff was eligible to apply for benefits, rejecting the board's initial reasoning. The board then considered plaintiff's application on the merits and

denied it. *Id.* at 235. In a letter informing plaintiff of the denial, the board again failed to announce any basis for its decision. *Id.* In the case in federal court, the parties filed motions for summary judgment, and the district court applied an arbitrary and capricious standard of review, ·found that the board ,reasonably could have found that plaintiff was not completely disabled prior to termination, granted defendant's motion and denied plaintiff's. *Id.*

The First Circuit reversed, finding that the plaintiff had been severely prejudiced by the board's failure to comply with the relevant ERISA regulations, including its delay and failure to provide the requisite notice. *Id.* at 237. The holding *of Bard* is expressly limited to its specific facts. *Id.* The First Circuit held: "when a plan with material· ambiguous terms violates ERISA in the manner that [defendant] did, and a claimant's application is prejudiced by these violations through his reliance on a reasonable interpretation that the plan does not ultimately adopt, we will bar the plan from using the claimant's reliance against him." *Id.* As a remedy, the First Circuit barred the · defendant from using evidence submitted by the plaintiff against him, and concluded, based on the remaining evidence, that the plaintiff was entitled to payment of benefits. *Id.* at 246.

█ CGEY argues that *Glista* and *Bard* are distinguishable because in this case, Sullivan did not file a claim for total disability benefits while she was still employed. The fact that Sullivan was terminated does not relieve the employer of its responsibility for following ERISA's procedures for processing a claim where the employee is at least arguably entitled to coverage. *See, e.g., Bard.* CGEY makes the further assertion, however, that Sullivan never filed a claim with CGEY at all

before filing suit.[6] (Def. Reply 17.) If this were true, it readily would distinguish this case from *Glista* and *Bard.* Unfortunately, to believe this statement requires applying an unreasonably narrow meaning to the phrase "filed a claim." On December 19, 2004, Fred Howarth of TBG sent an email to Andy Hauer at CGEY stating, in part, "You should expect to receive soon contact by [Sullivan]'s legal counsel regarding her claim for disability benefits under [CGEY]'s self insured plan. [Sullivan]'s insured benefits were first approved on a partial disability basis, and have subsequently been approved as to total disability." (Uzjco Reply Aff., Ex. 8.) Subsequent emails on which CGEY employees were copied confirm that CGEY was informed of both the existence of Sullivan's claim and the fact that she was seeking payment from CGEY directly. (Uzjco Reply Aff., Ex. 7.) Accordingly, it appears that CGEY was aware of Sullivan's claim as early as December 2004, more than a year before this litigation commenced.

The facts of this case, particularly as concern CGEY's handling of Sullivan's claim, give the Court pause. CGEY appears to contend that it operates a separate claims structure and organization with respect to the self-insured portion of the LTD Plan. Yet it has produced virtually no evidence to indicate that this is, in fact, the case. The circumstances of CGEY's handling of Sullivan's request for benefits suggest that, at best, CGEY's plan administration is not being run in conformity with ERISA mandates. *See, e.g.,* 29 U.S.C. § 1022(a) (requiring an ERISA plan to provide information about the plan "written in a manner calculated to be understood by the average plan participant and . . . sufficiently accurate and comprehen-

sive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan"); *see also* 29 C.F.R. § 2560.503–1(g)(*l*) (requiring "written or electronic notification" of any initial "adverse benefit determination"); *id.* § 2560.503–1(g)(1)(i) (requiring that this *233 notification explain the specific reasons on which the determination was based). At worst, the circumstances suggest it does not exist. CGEY has not offered any documentary evidence of its plan, its procedures, its claims review organization, or its appeal processes. If CGEY is to be believed, its characterization of the self-insured portion of the plan as "uninsured"[7] should sound alarms for CGEY employees, (who the plan ostensibly covers), investors and auditors alike. In this case, there is no evidence to suggest that Sullivan was informed of the procedure for filing a claim with the self-insured CGEY plan, even after it was made clear to CGEY that Sullivan was seeking benefits for total disability. Nor is there any evidence that CGEY conducted an internal review of the claim, or provided Sullivan with information regarding the basis for denial. The fact that Sullivan executed the Waiver may ultimately save CGEY from liability for Sullivan's claim, but it does not excuse the manner in which the claim was handled.

■ Despite CGEY's poor handling of Sullivan's claim, which led to the complete absence of an administrative record, this case differs markedly from *Glista* and *Bard.* Unlike the plaintiffs in *Glista* and *Bard,* under the facts presented here, other than the delay, Sullivan was not prejudiced by CGEY's failure to articulate the basis for denying her claim. CGEY's de-

---

**6.** The precise statement in CGEY's Reply is as follows: "Unlike Mr. Glista and Mr. Bard, Ms. Sullivan did not file a claim for company-

funded benefits with CGEY prior to filing this lawsuit," (Def. Reply 17).

**7.** *See* CGEY Br. Summ. J. 1.

fense is based on a contractual release, not on an interpretation of the plan language or of the facts concerning Sullivan's disability. Even if Sullivan had been apprised of the basis for the denial, she would not have been able to pursue a different strategy to obtain payment of her claim from CGEY in the face of the Waiver. Furthermore, in addition to being distinguishable, *Glista* and *Bard* are both First Circuit cases that do not bind this Court. Accordingly, the Court declines Sullivan's request to bar CGEY from asserting the Waiver as a defense based on its failure to inform Sullivan of that basis prior to this litigation.

### III. Conclusion

For the foregoing reasons, CGEY's Motion for Summary Judgment is **GRANTED,** and Sullivan's Motion for Partial Summary Judgment is **DENIED.** CGEY is **DISMISSED** as a defendant from Sullivan's First Amended Complaint

**IT IS SO ORDERED.**

### *JUDGMENT ENTRY*

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, it is hereby **ORDERED, ADJUDGED** and **DECREED** that the Motion for Summary Judgment filed by Defendant Cap Gemini Ernst & Young U.S. (Docket No. 41) is **GRANTED,** and Plaintiff's Motion for Partial Summary Judgment (Docket No. 48) is **DENIED.** Defendant Cap Gemini Ernst & Young U.S. is **DISMISSED** from this case.

**IT IS SO ORDERED.**